PENNSYLVANIA STEEL CO. et al. v. NEW YORK CITY RY. CO. et al.

FARMERS' LOAN & TRUST CO. v. METROPOLITAN ST. RY. CO. et al.
(two cases).

GUARANTY TRUST CO. OF NEW YORK v. SAME.

(Circuit Court, S. D. New York. August 29, 1911.)

Nos. 2–9, 2–23, 2–149, and 3–37.

1. RECEIVERS (§ 91*)—RECEIVERS FOR LEASED PROPERTY—ADOPTION OF LEASE.
    A court in possession, through its receivers of property demised by a lease, is not, prior to its adoption, express or implied, bound by any of its terms.
    [Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 167, 168; Dec. Dig. § 91.*]

2. RECEIVERS (§ 155*)—CLAIMS—PRIORITIES—EXPENDITURES—RIGHTS OF MORTGAGEES.
    Purchasers of the securities of a railroad company must be held to have bought with the fact in view that its property is devoted to a public use, that the demands of the public are first to be considered, and that expenditures made by a receiver necessary to render service safe and efficient may be preferred to the mortgage liens.
    [Ed. Note.—For other cases, see Receivers, Dec. Dig. § 155.*]

3. RECEIVERS (§ 155*)—CLAIMS—PRIORITIES—EXPENSES OF CONTINUANCE OF BUSINESS.
    Receivers were appointed for an insolvent street railroad company at suit of general creditors, the company having at the time cash and other assets constituting a substantial fund for the payment of creditors,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

190 F.—39

and its remaining asset consisting of a lease of a street railroad system which was being operated at a loss after payment of the rentals reserved. A week later the same receivership was, on its application, extended to the interest of the lessor in the demised property, with directions to the receivers to operate the property for the benefit of the public, and to conserve the same for the benefit of whoever might be entitled. The receivers were not directed to and did not adopt the lease, but, in fact, ceased to make payments thereunder, but they used whatever funds came into their hands from either estate in maintaining and operating the property and improving the same so as to render the service more safe and efficient. After several months a separate receiver was appointed for the lessee. *Held*, that the expenditures made for such operation, maintenance, and improvements after the receivership was extended to the lessor were not chargeable to the estate of the lessee, which received no benefit therefrom, and that its receiver was entitled in equity to recover such of its funds as were used for such purposes from the receivers for the lessor in preference to the claims of the mortgagees of the latter.

[Ed. Note.—For other cases, see Receivers, Dec. Dig. § 155.*]

In Equity. Suits by the Pennsylvania Steel Company and others against the New York City Railway Company and others, by the Farmers' Loan & Trust Company against the Metropolitan Street Railway Company and others, and by the Guaranty Trust Company of New York against the Metropolitan Street Railway Company and others. In the matter of the petitions of the Pennsylvania Steel Company and others, creditors of the New York City Railway Company. On exceptions to report of special master. Exceptions overruled, and report modified and affirmed.

See, also, 165 Fed. 467; 190 Fed. 623.

Following is the report of the special master:

As the answers to all of the other questions propounded by the court depend upon the answer to the question as to the incidence of expenditures made and obligations incurred by the receivers as its officers with respect to the property demised by the lease from the Metropolitan to the City Company during the period from September 24, 1907, to August 1, 1908, or any part of that period, it has been agreed that the liability of two general classes of expenditures shall be decided, viz.: (1) Clearly operating expenses, of which conductors' wages are a type, and (2) betterments and improvements, of which it is agreed that certain scraper cars and feeders are types. It is admitted that the conductors' wages were paid for the operation of some of the roads demised which were subject to both the general and refunding mortgages made by the Metropolitan Street Railway Company and included in the two foreclosure decrees, and that the scraper cars and feeders are subject to one or the other of these mortgages and are included in the property to be sold under such decrees.

When the court on the 24th day of September, 1907, at the instance of the two plaintiffs, the petitioning contract creditors of the New York City Railway Company acting on behalf of all others, took under its control practically the entire system of street surface railways in the boroughs of Manhattan and the Bronx demised to that company by the Metropolitan Company, it also took over assets of the City Company consisting of $683,898 in cash; materials and supplies $1,116,792; accounts receivable to the extent of several hundred thousand dollars, certain choses in action since reduced to possession by its receiver amounting to some millions of dollars a large part of which is, however, claimed by Metropolitan receivers, and two miles of railway track in Mt. Vernon which was all the railway track it owned. This last-named asset has since been sold for $500, which

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

with the proceeds of the choses in action is in possession of the receiver of the City Company, but the other assets enumerated are in the possession of the receivers of the Metropolitan Company, not having been turned over by them on August 1, 1908, when the appointment of the separate receiver of the estate of the City Company as such in place of Messrs. Joline and Robinson, who had prior to that acted in both capacities, went into effect. These other assets amounting in value to over $2,000,000 constituted a substantial fund for the payment of creditors of the City Company, both contract creditors, preferred or general, and tort creditors as well, but they have not been surrendered, as the administration of the railroad properties from September 24, 1907, to August 1, 1908, resulted in an operating deficit of over $1,000,000 which is increased by nearly $2,000,000 for expenditures actually incurred and met from sources other than earnings during the period in question for improvements and betterments, exclusive of several millions in addition for obligations for similar betterments and improvements incurred but not met during such period. If this deficit is to be borne by the estate of the City Company, and the equivalent in value of its assets above described is not to be accounted for to its receiver by the Metropolitan receivers, the fund for the payment of its creditors will be depleted and the Metropolitan bondholders whose security has been preserved and improved by the court's operation will presumptively reap a benefit from the expenditures mentioned for which they have not paid. The object of this proceeding instituted on petitions of committees of the contract and tort creditors of the City Company duly recognized by the court is to obtain just such an accounting, the bondholders of the Metropolitan Company through their trustees resisting it, with the receivers of the estates of both companies represented and ready to furnish all information, but remaining neutral as to the particular questions involved.

Some account of the history of the relation of the two companies prior to the receivership and of the receivership during the period involved, familiar as it is to court and parties, is necessary to an understanding of the contentions involved. In 1902 practically the entire street surface railway system of the borough of Manhattan and the Bronx was operated by the Metropolitan Company, as owner, lessee, or through the control of stock of companies whose independent existence and operation continued. Its outstanding share stock then as now was $52,000,000 on which it had paid dividends for years of 7 per cent. In 1901 and 1902 these dividends, though paid, were not earned, deficits resulting of $31,000 in 1901, and $216,200 in 1902, which did not include franchise taxes then in dispute, but paid since the receivership, nor interest on the floating debt, which would have increased these yearly deficits by over $600,000 in each year. On the 14th day of February, 1902, as on the 24th of September, 1907, in addition to its own outstanding bonded debt, there were outstanding against its properties various bonded debts, and in 1902 it owed in addition to all these a floating debt of about $11,000,000.

The City Company in 1901 acquired the property of the North Mt. Vernon Railway Company which had been sold in 1898 for about $15,000. It consisted of two or three miles of track in Mt. Vernon, a car barn, and three or four cars, and it constituted the only railway asset of that company above referred to. It had no direct connection with any of the lines owned, leased, or operated by the Metropolitan Company, although it did then or later connect with those of the Union Railway the stock of which the Metropolitan Company controlled. The City Company also had a traffic agreement with the Ft. George & Eleventh Avenue Railroad Company, but the road of that company consisted of but a mile of track on 145th street in the borough of Manhattan extending eastward from Eleventh avenue to the Harlem river. While some stress is laid on these facts, it is, of course, obvious that these tracks formed no part of any line or route important to the system, and that they furnished no connection with that system which either the court or its receivers would for a moment at any time have deemed it necessary to preserve.

On February 14, 1902, the Metropolitan Company leased its system to the City Company for 999 years in consideration of the latter's promises

to operate, maintain, and keep it in repair, to pay the former's obligations as they accrued except the principal of its funded debt, and to pay an annual rental of 7 per cent. upon its outstanding share stock of $52,000,000. The items of interest and rentals accruing yearly thus assumed amounted to over $10,000,000 in addition to the annual rental of $3,640,000. It further agreed to pay $23,000,000 to be used to pay its floating debt, and for the improvement, extension, and equipment of the property, and this it paid prior to May 22, 1907, advancing in addition $2,834.000 for construction work prior to the receivership for which the Metropolitan Company by the terms of the lease was on September 24, 1907, its debtor. Betterments and improvements of the character of the scraper cars and feeders here in dispute were to be paid for by the Metropolitan Company under article 15 of the lease.

Operation under the lease by the City Company began in April, 1902, and payment of the fixed charges and rental continued during that portion of the term between that time and the appointment of the receivers, but with a constantly increasing annual deficit, as shown by the reports to the Railway and Public Service Commissions amounting from June 30, 1902, to September 20, 1907, to $11,425,939, which amount does not include more than $3,000,000 for disputed franchise taxes for such period recently paid on adjustments obtained by the receivers. These payments sufficiently account for the insolvency of the lessee company, and show not only that the Metropolitan stockholders received for five years or more dividends that were not earned, but that Metropolitan bondholders received interest for at least a year prior to the receivership amounting to more than $1,265,000 that was not earned.

On September 24, 1907, the creditors' bill was filed and an order entered with the City Company's assent appointing Messrs. Joline & Robinson temporary receivers of the estate of the lessee company, including the assets owned by it above described and this leasehold interest. The bill contained the usual allegations, among them allegations that the lessee's only means of meeting its obligations to its lessor were by continued operation as a whole, and that a receiver was needed with power to that end for the preservation of the property and the accommodation of the public, with a prayer for such appointment "to preserve the unity of the system as it has been maintained and operated." These allegations, however, though the contrary is urged by the bondholders, it is understood bind nobody, not even the parties making them, and furnish no aid in determining which estate shall ultimately bear the deficit in operation. Ames v. Union Pacific R. R. Co. (C. C.) 74 Fed. 335. The order entered also contained provisions for continued operation to the end "that operation of the railroad system of the defendant shall be continued in the same manner as at present and the public duties obligatory upon the defendant be in all respects discharged."

On October 1, 1907, just one week after the entry of this order, the Metropolitan Company filed its petition stating that it was of vital importance to itself and its creditors that the property be kept intact, alleging its own insolvency caused by that of its lessee, and suggesting as a reason for the court's prompt interposition that the lease reserved no right of entry for any default until a year after such default and after written demand and notice. It asked to be made a party defendant, and that the receivership be extended to its property, and on the same day the same men were appointed temporary receivers of that property which was thus made liable for the result of subsequent operation. N. Y. Security & Trust Co. v. St. Louis, Cons. R. R. Co. (C. C.) 102 Fed. 391.

In the opinion granting the application, the court said that: "The receivers are now in possession of the earning power of the petitioner, and under the terms of the lease petitioner can avail of no default in payment of the amount stipulated within a year from such default. The property is an intricate combination of various roads, one or more of which might be cut out of the system by failure to pay interest on some underlying mortgage or some rental due the constituent road. It is of vital interest to the petitioner that the property be kept intact. * * * The interests of lessee and lessor are different and in a sense diverse. Nevertheless it

seems practicable to adjust all questions in a single receivership. * * * Their (the receivers') sole functions are to hold the property intact, operating it as efficiently for the public service as their resources will permit, to ascertain the liabilities, to marshal the assets, and, eventually, unless in the meantime some entirely solvent concern able to liquidate all obligations and succeeding to owners' and lessees' interests shall appear to take it off their hands, to sell it to the best advantage, and apply the proceeds to the payment of the liabilities. It is thought that the present receivers can do this as holders of the interests of both lessor and lessee. Should future experience seem to indicate that a separate trustee for one of the parties is required, some way to meet that difficulty will be found." Penn. Steel Co. v. New York City Ry. Co. (C. C.) 157 Fed. 442.

On October 9, 1907, the Morton Trust Company, trustee under the refunding mortgage, to whose rights and obligations under that mortgage the Farmers' Loan & Trust Company, respondent in this proceeding, has in the meantime succeeded, filed a bill of re-entry, and at its instance the same receivers were appointed of the mortgaged property and its income. This mortgage was made by the Metropolitan Company subsequent to the lease, to which it was subject, and it covered that company's reversionary interest in all of the property demised to the City Company of which that covered by the mortgage to the Guaranty Trust Company made prior to the lease was a part. On this same day, too, an order had been entered making the receiverships of the Metropolitan and City estates permanent, such order having been entered in pursuance of an opinion filed the day previous, in which the court, after referring to its prior memorandum quoted from above, said: "Having taken its (Metropolitan's) entire property into possession of the court under conditions which left it powerless to recover the same for a year, the receivership left it wholly without means to meet its obligations, and it seems to be clearly the duty of the court which has thus deprived it of its resources to protect it against execution while receivers handle and distribute those resources. *Having possession of the res, the court acquires jurisdiction of its owner.*" 157 Fed. 445. After referring to rentals due to companies leasing their lines to the Metropolitan and to the interest on various mortgage bonds of such roads which by the lease the City Company had covenanted to pay and directing the payment of the same, it continued: "This will not include the rental to the Third Avenue Company which will fall due the last of this month (October, 1907). A clause in the lease by that road provides that default in the payment of any installment of that rental cannot be availed of for six months. * * * Until further orders the receivers will also, if the other parties to such arrangements consent, carry out the arrangements by which the New York City Railway Company operates certain railroads not under lease, such as the Dry Dock, East Broadway and Battery Railroad and the Union Railway." Penn. Steel Co. v. New York City Ry. Co. (C. C.) 157 Fed. 446.

On November 9, 1907, alleging defaults in payment of interest due under the Third Avenue mortgage, the Morton Trust Company filed its bill for foreclosure, and again asked the appointment of receivers in that suit which was made, the same receivers being appointed by an order entered on November 19, 1907. A similar bill alleging similar defaults was again filed by it on June 12, 1908. In obedience to the direction of the court, the receivers paid no dividends, rentals, or interest on the stock or bonds of the Third Avenue accruing under the lease by it to the Metropolitan and by the Metropolitan to the City Company, and the Central Trust Company, trustee under the mortgage securing its bonds, having filed its bill of foreclosure, an order was entered on January 6, 1908, appointing Frederick W. Whitridge, Esq., as receiver of the Third Avenue Railroad Company, and in pursuance of an order entered January 9, 1908, the property of that company comprising as it did two-fifths of the whole Metropolitan system, was transferred at midnight between January 11th and January 12th to its receiver. The system was still further disintegrated on May 1, 1908, by cessation of operation over the tracks of the Fulton Street Company, on June 29, 1908, over those of the 28th and 29th Street road, and later on, on the petition

of the receivers filed June 17, 1908, over those of the Central Park, North & East River Company known as the "Belt Line."

On February 26, 1908, the Guaranty Trust Company, trustee under the general mortgage of the Metropolitan Company made in 1879, prior to the lease, covering a portion of the property subsequently demised, filed its bill of foreclosure. On March 17, 1908, an order was entered appointing the same receivers of the property thus mortgaged to it. Its bill prayed that the City receivers be directed to account and pay over to the receivers to be appointed in the cause thus begun by it the entire net earnings of the street railways and property in their possession covered by its mortgage not exceeding the rental reserved in the City lease so long as said lease might continue in force.

In its answer to the petition of the Morton Trust Company filed June 24, 1908, that possession of the leased property be turned over to the Metropolitan receivers, and that a separate receiver of the City Company be appointed, the Guaranty Trust Company stated that it had not theretofore applied for a separate receiver of the property involved in its suit, as its mortgage extended to a portion only of the Metropolitan property, and that it did not believe that sufficient advantage would result to its bondholders from separate operation to justify a disintegration of the system. Up to this time on June 24, 1908, just nine months after the appointment of the receivers at the instance of the City Company, neither mortgagee had asked for a separate receivership, but the result of all these proceedings is summed up by the court's statement that "the entire system as a going concern was placed in the hands of the court, on the application of a creditor of the lessee, but with the assent of both companies and the subsequent approval of the representatives under the lessor mortgages." Id., 165 Fed. 465. On July 28, 1908, William W. Ladd, Esq., was appointed separate receiver of the City Company, Messrs. Joline and Robinson retaining possession of the Metropolitan system as receivers of that company's property which they have been operating since. In the order making this appointment, the court reserved the right to impose a lien upon the properties constituting the Metropolitan system for the unpaid obligations of the receivers prior to August 1, 1908, and directed the Metropolitan receivers to account to receiver Ladd for all the City Company's assets, which petitioners now insist they have not done.

Certain undisputed facts bearing upon the general equities involved as to the condition of the property taken over by the receivers on September 24, 1907, and as to the character of their expenditures during the period in question, may be noted in concluding this statement of facts. In their report in evidence the receivers stated that at that time the condition of the operating plants with the exception of the power houses had been allowed to deteriorate to so great an extent that a collapse was imminent, and that, "realizing that the interests of the holders of the corporate securities, and the welfare of the public at large demanded the continuance of the operation of the property, as an entirety, they set themselves to the task of rehabilitation." The condition of the cars on hand was bad and the destruction of over 600 cars necessitated the purchase of 155 pay as you enter cars, 89 standard closed cars, 22 snow sweepers, and 10 slot scrapers. It was also necessary to install improved sprinkler apparatus and new substation equipment. The electric track installed from 1897 to 1900 was worn to an extent that subjected the rolling stock to great strains and jars, and much rehabilitation of track structure was therefore instituted. The expenditures made for these purposes were under the supervision and direction of the court which confined them to such as were necessary. Id., 160 Fed. 223. That they were necessary is fully indicated by the testimony adduced before me. They have undoubtedly preserved the system, and have probably to a considerable extent added to its value, much of the property purchased and installed being now included in that to be sold under foreclosure.

It is conceded by the respondents that neither the court nor its receivers at any time prior to the entry of the formal order directing the surrender of the demised property on August 1, 1908, ever adopted the lease. Indeed, the acts of the receivers taken under the direction of the court, at the very in-

ception of the receivership, amounted to an open renunciation of it. They were directed not to pay the dividend due in Ocotober, 1907, by way of rental on Metropolitan stock, and, of course, did not. They were directed not to pay dividends on the stock of the Third Avenue Company, due October 13, 1907, and interest on the bonds of that company due January 1, 1908, both of which payments were fixed obligations accruing on the dates named as rental under the lease of that company to the Metropolitan and absolutely assumed by the City Company as a fixed charge payable by way of rent from it, which defaults on January, 1908, resulted in cutting out a most important two-fifths of the entire system committed to their charge. They were instructed to eliminate the Fulton Street Road, the Twenty-Eighth & Twenty-Ninth Street Road, and later on the Belt Line, the last important not only because of its length, but because of the connections it insured. That they had a reasonable time within which to determine whether it would be to the advantage of all interested in the property either as creditor of either company or as lessor or mortgagee to adopt the lease is, of course, established (Quincy Ry. v. Humphreys, 145 U. S. 82, 105, 12 Sup. Ct. 787, 36 L. Ed. 632; U. S. Trust Co. v. Wabash, 150 U. S. 287, 14 Sup. Ct. 86, 37 L. Ed. 1085; Park v. N. Y., Lake Erie & W. Ry. Co. [C. C.] 57 Fed. 799); nor is it urged that the 10 months that elapsed before there was a formal separation of interests by the entry of an order appointing a separate receiver of the City estate was so unreasonably long as to constitute an adoption, as, in view of the complexity of the system and the vast financial problems, difficult legal questions and onerous obligations to the traveling public involved, it could not be. There is, however, no approach to unanimity in the positions of the two mortgagee trustees, respondents here, respecting the question as to whether during the period the lease controls as to the obligations of the City Company and as to the right of its estate to reimbursement for expenditures made or obligations incurred while operating. Counsel for the Farmers' Loan & Trust Company, though in substance conceding that the City estate in the hands of the receivers is not bound by the terms of the lease in the sense that it would be had it been adopted, nevertheless insist that during the 10 months involved it does control, and their whole argument is based mainly on that legal proposition. Thus they say that, "as far as all expenditures for current maintenance and operation are concerned, it is clear from the lease that they are to be paid by the lessee or whoever claims under it," and this includes the conductor wage type of operating expense above referred to; and while conceding as strict logic would seem to require that the lease also controls as to outlays for construction of which the scraper cars and feeders are the stipulated types, and that by article 15 such outlays constitute an ultimate charge against the Metropolitan estate, they avoid the effect of this concession by restricting reimbursement to securities or funds of the Metropolitan which might properly be used for that purpose if it shall appear on a complete accounting that there are such, which I take to mean funds or securities in excess of those needed to satisfy the mortgage liens. To the contrary of this, counsel for the Guaranty Trust Company says that "the lease was a contract between the Metropolitan and City Companies which the receivers of neither company adopted in any such sense as to be bound by it as an executory contract, and that the right of the lessee company's receivers to reimbursement for any expenditures during the period of their possession must rest either upon contract or upon some equitable ground; that there is no contract upon which it can rest except the lease; that obligations for reimbursement arising under the lease are the obligations of the Metropolitan Company and not of its receivers; and that, if any equitable ground exists (which he denies), it cannot arise out of the lease."

[1] That a court in possession through its receivers of property demised by a lease is not, prior to its adoption, express or implied, bound by any of its terms, is I think to be now regarded as generally and definitely settled. The principle as laid down by the Supreme Court in the cases arising out of the Wabash receivership, cited supra, has, perhaps, not been always followed out, and there are doubtless expressions in judicial opinions which considered apart from the facts suggesting them lend some support to the

contention, of counsel for the junior mortgagee. Such expressions occur in the cases relied on. Clyde v. Richmond & D. Rd. Co. (C. C.) 63 Fed. 21; ·Johnson v. Lehigh Valley Traction Co. (C. C.) 130 Fed. 932; Central Trust Co. v. Wabash, etc., Rd. (C. C.) 34 Fed. 259; more particularly Farmers' Loan & Trust Co. v. Northern Pacific R. R. Co. (C. C.) 58 Fed. 257; and Felton v. City of Cincinnati, 95 Fed. 336, 37 C. C. A. 88. Nevertheless all of these were cases where the facts suggest an implied adoption of the lease. The rule as laid down in this circuit in the Erie receivership (supra 57 Fed. 799) and accepted by Judge Lurton speaking for the Circuit Court in N. Y. Penn. & O. R. R. Co. v. N. Y. Lake Erie, etc. (C. C.) 58 Fed. 268, is, however, as stated, and that rule has been nowhere applied in any of the cases to facts more closely resembling those here under consideration than in Mercantile Trust Co. v. Farmers' Loan & Trust Co., 81 Fed. 254, 26 C. C. A. 383, decided by the Circuit Court of Appeals for the Eighth Circuit. That was an appeal from an order denying the receivers of the St. Louis & San Francisco Railroad Company leave to renounce four leases. The receiver had been appointed in a suit to foreclose a consolidated mortgage made by the lessee company subsequent to the date of the leases to it of four railroads, which leases secured bonds that were issued under first mortgages upon the respective roads made simultaneously with the leases. The San Francisco Company covenanted in each lease to pay taxes, to operate, and to pay certain rent in no event less than the interest on such first mortgage bonds. The receivers appointed in foreclosure of the consolidated mortgage made by the lessee to the appellant Mercantile Trust Company operated the four-leased lines for a year when they petitioned for leave to renounce the leases, and on reference to a master the trustees under the first mortgages appeared before him and resisted the application. He reported insufficient earnings from leased lines, but that the unity of the property covered by the consolidated mortgage was its chief value, and should be preserved, that the leases should be affirmed, and the deficiences met out of the earnings of the entire system, and this report the court confirmed, adjudging the receivers liable for the rentals, and making them a lien superior to the consolidated mortgage. The appeal taken by the trustee under that mortgage therefore squarely suggested the question here involved, and the court, speaking through Judge Sanborn, said: "Counsel have devoted much time and space to a consideration of the question whether or not the income of the entire property covered by the consolidated mortgage was sufficient to pay its operating expenses and rent reserved under these leases during the receivership. That question is immaterial. If the leases should have been renounced, no part of the deficiency resulting from the operation of the leased lines can be charged against or paid out of the proceeds of the corpus of the trust estate (the property of the lessee covered by the consolidated mortgage), but these deficiencies must all be paid by the railroads which respectively caused them;" and the cases cited in support of this proposition include not only the cases above cited arising out of the Wabash and Erie receiverships and in addition those out of the Union Pacific receivership (Ames v. Union Pac. R. Co. [C. C.] 60 Fed. 966, and Id., 74 Fed. 335), but two of the very cases mainly relied on by counsel here in support of the contrary of the proposition, viz., the Central Trust Company v. Wabash and the Northern Pacific Cases, supra. On the other hand, the court said that, if the leases had been properly adopted by the court below, then the rentals reserved became an integral part of the operating expenses of the trust estate in the hands of the receivers, and secured a preference in payment not only out of income, but out of the corpus of the trust, and it held that they had been.

This case is conclusive, not only against the contention that the lease during the period in dispute controls for 'certain purposes which is urged in behalf of the junior mortgagee, but, if well decided in its application of principles determined by the Supreme Court, it is conclusive, also, as to the contentions urged on behalf of the senior mortgagee which are based not upon the lease—which, as I have stated, it concedes does not control—but upon general equitable principles. These, I think, are two which may be thus

summarized: (1) That a court of equity will not displace the lien of a mortgage on property of which it has taken possession at the instance of the owner, or of his lessee or of the creditors, secured or unsecured, of either, for the payment out of such property of expenses incurred in its operation and preservation, even if such expenses be dictated by strict necessity and the property be of a nature requiring its continued use for public purposes, provided there be any other fund out of which such payment can be made; (2) that, even if no fund exist, such lien can be displaced only in cases where the liabilities incurred result from strict necessity, and that the exercise of the power is then confined to such expenditures as would come within the operation of the 6-month rule had they been made by the mortgagor.

It is obvious, not only that neither of these asserted principles find any support in the case above cited, but that they are in violation of it, and I am referred to no case which flatly lays down either doctrine except the case of the N. Y. Security & Trust Co. v. Louisville, etc., R. R. Co. (C. C.) 102 Fed. 397, decided at Circuit, in 1900, which does lay down the first. There receivers were appointed of a consolidated company at the instance of creditors and subsequently of the trustee of its mortgage. The company had resulted from the consolidation of companies owning lines subject to divisional mortgages so called which were subsequently foreclosed; a receiver having been also appointed in these latter suits. The master held that the expense incurred in operating each division during the first receivership should be charged to the division which caused it, but the court held that the expenses of the receivers incurred before a receiver was appointed at the instance of divisional mortgagees should be first paid out of any surplus that might arise from the entire properties after paying the divisional bondholders. Notwithstanding the thorough discussion by counsel of the cases involved, I am unable to reconcile this case, not only with the San Francisco case, but with the decision of the Supreme Court, in Union Trust Co. v. Ill. Midland Railway Co., 117 U. S. 469, 6 Sup. Ct. 809, 29 L. Ed. 963, or with the decisions arising out of the Union Pacific receivership in the Gulf Company and Gunnison Company Cases (C. C.) 60 Fed. 967, and 74 Fed. 335, in which as it seems to me the opposite conclusion was reached.

[2] With reference to the second principle asserted by counsel for the senior mortgagee, it is to be noted that, if it be correctly stated and applied, then the power of a court upon which circumstances have imposed the serious obligation of operating railroad properties or other public utilities is, if not nullified, so far curtailed as to make it dangerous for it to attempt to operate at all. It doubtless is the rule marked out in the many cases cited by counsel in support of his extension of the doctrine that only those expenditures of a corporation which the creditor would have a right to expect to have met out of current income as distinguished from those for construction, including not only betterments, but perhaps even more or less necessary repairs involving restorations of permanency can be preferred and are then payable only out of income, unless diversion be shown when they become payable out of the corpus to the displacement of prior liens. These cases are Lackawanna Co. v. Farmers' Loan & Trust Co., 176 U. S. 298, 20 Sup. Ct. 363. 40 L. Ed. 475; International Trust Co. v. Contracting Co., 95 Fed. 850, 37 C. C. A. 396; Illinois Trust & Savings Bank v. Doud, 105 Fed. 125; 44 C. C. A. 389, 52 L. R. A. 481; Fordyce v. Omaha R. R. Co. (C. C.) 145 Fed. 544; Street v. Maryland Ry. Co. (C. C.) 59 Fed. 25; New England R. R. Co. v. Carnegie Steel Co., 75 Fed. 54, 21 C. C. A. 219; Bound v. S. C. R. R. Co. (C. C.) 51 Fed. 58; Atlantic Trust Co. v. Dana, 128 Fed. 209, 62 C. C. A. 657; Rodgers Ballast Car Co. v. Omaha, 154 Fed. 629, 83 C. C. A. 403, to which may be added the most recent expression of the Supreme Court cited by counsel for the junior mortgagee on this question in Gregg v. Met. Trust Co., 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717, in which by a divided court an indebtedness for railroad ties contracted prior to the receivership was held not to be entitled to preference, even though the receivers retained and used some of the ties; no diversion of income having been shown. These cases, however, refer only to expenses incurred by the

corporation itself, and do not hold that this doctrine controls a court operating, not only for the benefit of all ultimately entitled to the property, but for the convenience of the public as well, and such is certainly not the rule in the federal courts. Atlantic Trust Co. v. Chapman, 208 U. S. 360, 28 Sup. Ct. 406, 52 L. Ed. 528; Kneeland v. Bass Foundry & Machine Works, 140 U. S. 592, 11 Sup. Ct. 857, 35 L. Ed. 543; Union Trust Co. v. Midland R. R. Co., 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963; Miltenberger v. Logansport R. R. Co., 106 U. S. 286, 1 Sup. Ct. 140, 27 L. Ed. 117. Indeed, it has been repudiated by the Circuit Court of Appeals in this circuit in these very litigations for on the appeal from the order authorizing receivers' certificates for expenditures for just such betterments and constructive items as are here involved it affirmed the order, thus opening the way to a possible, if not probable, displacement of the liens of these mortgages, as to which it said: "The justification of displacing liens is the preservation of the property upon which they exist." Penn. Steel Co. v. N. Y. C. R. Co., 163 Fed. 243, 90 C. C. A. 188. If it were the doctrine, it is easy to see where it would lead. In the Lackawanna Case, supra, the Supreme Court decided that expenditures incurred by the Houston & Texas Railway Company to replace rails the condition of which, as the master found, was such as to make travel unsafe, did not constitute an indebtedness of such a nature as to justify displacement of the mortgage lien. To hold the doctrine urged would therefore mean that the court has not the power to incur expenditures to make travel safe. I think the true view is that purchasers of the securities of a railroad company must be held to have bought with the fact in view that its property is devoted to a public use, that the demands of the public are first to be considered, and that just such expenditures may be preferred, if the occasion arises, as this court, having such principle in mind (157 Fed. 445), decided might be made when it entered its order of October 29, 1907, among others in evidence here, reciting that the expenditures by the receivers then authorized were "necessary to make the road under their charge efficient, to place their equipment in proper condition, and to perfect the service of said roads." Those expenditures thus authorized included, among others, such "betterments," if that be the proper characterization where improvements are suggested by necessity, as are indicated by the stipulated types of feeders and cars here in dispute.

[3] Moreover, apart from the consideration of the refinements and distinctions drawn from the precedents elaborately presented and discussed in the briefs, it is clear to me that the equities suggested by the facts here present, effectively grouped by their counsel, are wholly with the petitioners. The assertions made in behalf of the senior mortgagee that the principle underlying the petitioner's claim is that one who expends money upon the property of another, either with or without his consent, is entitled to a paramount lien upon such property for the amount of the expenditure, or that the proposition of law urged by them is that a court of equity, at the request of a stockholder or creditor (including a lessee and the lessee's creditors), will undertake to experiment with the property of an insolvent corporation at the risk of its bondholders in disregard of all liens—the benefits of the experiment, if any, to accrue to the petitioning creditor, while, if loss results, the burden is to be thrown on the bondholders—altogether misconceive the position taken on behalf of those creditors. That position is that a fund of upwards of $2,000,000 in value of property on which the court by the appointment of its receivers made an equitable levy which would have inured largely to their benefit ought not to be expended to their detriment in the operation of a system of street railroads covered by a lease constituting their debtors' only other asset, when the partial preservation of the unity of that system, of primal importance to the public, has inured almost wholly to the advantage of these very mortgagees and to theirs not at all. That such position involves the possible displacement of liens and the exercise of a power in the court, challenged it is true, but which for reasons stated, must be held to exist, so to charge property devoted to a public use, both for operation and improvement, does not deprive it of any of its force, even though it be conceded that such power is to be exercised with proper caution, for the wisdom and propriety of the expenditures actually made is not only not challenged, but

substantially admitted. Had the court, on the very day that it entered its order of October 1, 1907, extending the receivership to the interest of the lessor at the latter's express instance, inserted in that order a provision that the lease be deemed not to be in effect, there can be no doubt that the quick assets of the lessee would have gone to its creditors without challenge, and that the burden of subsequent operation would have fallen where petitioners now contend it should fall. Neither can there be much doubt that if the facts disclosed by the record as to the financial history of the Metropolitan for two years prior to the lease and of its lessee under the lease for the years ending in the receivership had been known to the creditors and had been put before the court at that time, just that direction, if demanded, would have been inserted in that order. Those facts known at the time from public reports, though not necessarily to creditors, contract or tort, who were under no obligation to know them, demonstrate clearly the utter hopelessness of expecting that any profit would accrue to those creditors from continued operation, for a profit to them meant that many millions in excess of the receipts from operation that the experience of the prior years indicated as probable would have to be earned to meet the fixed charges accruing under underlying leases and mortgages, the interest on the consolidated mortgages, franchise taxes, and the rental to the lessor company, all of which would have had to be earned before anything could have been added to the funds available for payment to those creditors. In the light of these facts which, if unknown to the mortgagee trustees, they were certainly under more of an obligation to know than were the petitioners, operation during the period in dispute can hardly be called an experiment, but, if it could, it was an experiment which they, too, had it in their power to end in the earliest part of that period, and for it they must accept their share of responsibility. No court would then have refused them the surrender involved in a separation of receiverships—from any aspect, as it seems to me, a pure matter of form and not of substance—which neither asked for until June 24, 1908, for this very condition of hopeless insolvency put an end to the period of grace after default provided for in the City and Third Avenue leases which they not only now urge as a reason for their own inaction, but point to without convincing reason as something of which the petitioners were attempting to take advantage. Quincy R. R. Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787, 36 L. Ed. 632. I therefore think that that should be regarded as having been done that should have been done; that, since no intervening equities prevent, a provision should be regarded as having been contained in the order of September 24, 1907, directing that the lease be not adopted; and that whatever words of description the receivers may have used in their transactions during the period in dispute, or however they may have been spoken of by parties or the court, they should be deemed to have been, just what the court has called them, operating conservators of the property in its custody committed to their charge for the benefit of those ultimately entitled and, for the purpose of deciding the incidence of the deficit from operation during the whole of the period in question, receivers of the property of the Metropolitan Street Railway Company.

I am aware that for the week elapsing between their first appointment and October 1, 1907, when the lessor company intervened, a doubt has been expressed, though not by petitioners who assert the contrary, as to whether they can be so regarded, but I think that, as matter of law, they not only can, but should be. The court has said in the expression italicized above of its act in appointing receivers on the earlier date that having taken possession of the res, it acquired jurisdiction of its owners, and the Supreme Court in the Illinois Midland Case, 117 U. S. 460, 6 Sup. Ct. 809, 29 L. Ed. 963, clearly lays down the doctrine that those ultimately entitled, like the respondents here, as mortgagees, are not entitled in the first instance to notice of application for leave to make expenditures in displacement of their lien such as are here involved which may be authorized before they were parties—and in that case were—but that what they can ask is, what is now in this proceeding being accorded to them for expenditures made during the

whole period in dispute including its first week, full opportunity to be heard before the incidence of those expenditures has been determined.

Contentions are urged on behalf of both the respondents that admissions in answers interposed by the petitioners to amended bills in the foreclosure suits that Messrs. Joline & Robinson, were operating as the receivers of the New York Railway Company during the disputed period are conclusive against their present contentions. Such admissions are, however, equivalent to nothing more than statements that the lease was then in force—an admission of a conclusion of law, as to which the mortgagees themselves are not in accord, which binds nobody. So it is urged on behalf of the junior mortgagee that the order made by the Circuit Court of Appeal on the appeal from the order authorizing the issue of receivers' certificates directing an extension of the lien of those certificates to the property and net income of the City Company and the order made by the Circuit Court separating the receiverships and directing the surrender of the property covered by the lease, to which proceedings the petitioners were parties, make the question as to who was operating res adjudicata as to them, and constitute a bar to this proceeding. In the final order made in the latter proceeding, however, the court expressly reserved the right to impose a lien upon the properties constituting the Metropolitan System for the unpaid obligations of the receivers prior to August 1, 1908, and directed Messrs. Joline & Robinson to account to receiver Ladd for all the City Company's assets, thus leaving the very question here involved open; while, in the former proceeding, the amendment of the order concludes parties including the trustees themselves only as to the extension of the lien to net income, meaning undoubtedly, income, if any, in excess of payments from receipts of all charges reserved by the lease including dividend rental to Metropolitan stockholders, or, in other words, income from operation under the lease which would mean its adoption. The court did not by that order determine that there had been such adoption or income, nor what net income is, nor to whom, subject to the lien, it should be paid, and neither the parties nor any one else are concluded as to such questions. Moreover, this question which is based on the order of the Circuit Court of Appeal made in May, 1908, as well as the arguments of respondents, based upon expressions of the petitioners, or of the receivers, or even of the court, as to the existence of the lease, or character of the operation during the disputed period have been disposed of by the court itself when, writing in September, 1910, and referring to the opinion handed down on the separation of the receiverships in July, 1908 (Penn. Steel Co. v. New York City R. Co. [C. C.] 165 Fed. 463), and to whether the lease had terminated or not, it said: "But up to that time the question when it terminated or whether it had terminated had not been raised nor argued, and *it was not then and has not been since decided.*" Id., 182 Fed. 159.

Having this in mind as well as the further declarations of the court contained in the same opinion that the better way is "to consider the receivers (during this disputed period) as acting in a dual capacity, representing both companies, but so far as the public was concerned, using money indifferently from whatever source it came to secure an efficient service and effect a restoration of the property which was in a deplorable condition," and that "subsequent accounting between the two estates will (would) determine what money should have been thus used and upon which estate lay the burden of keeping up the property as a going concern," I shall report to the court the following answers to the questions contained in its order:

(a) That the lease, dated February 14, 1902, made by the Metropolitan Street Railway Company to Interurban Street Railway Company (now New York City Railway Company) so far as the properties demised by it taken into its possession by the court through its receivers on September 24, 1907, are concerned, should be deemed to have been no longer in effect after said last-mentioned date.

(b) That during the period from September 25, 1907, to July 31, 1908, both inclusive, Adrian H. Joline and Douglas Robinson, as officers of the court, were acting in a dual capacity as receivers of Metropolitan Street Railway

Company and New York City Railway Company and as conservators of said properties demised by said lease for the benefit of the public and of those ultimately entitled thereto, including the lessor's mortgagees, and were operating said properties as receivers of the property of Metropolitan Street Railway Company.

(c) That the expenditures made and obligations incurred by Adrian H. Joline and Douglas Robinson as officers of this court, with respect of the property demised by the said lease during the period from September 24, 1907, to August 1, 1908, of which the expenditures for conductors' wages for scraper cars, and for new feeders are types, are chargeable against the estate of Metropolitan Street Railway Company.

(d) That the receipts of Adrian H. Joline and Douglas Robinson as officers of this court in respect of the property demised by said lease during the period from September 24, 1907, to August 1, 1908, are to be credited to the estate of Metropolitan Street Railway Company except such receipts as constitute a part of the estate of New York City Railway Company separate and apart from said lease and said property thereby demised.

(e) That said lease was at no time adopted by Adrian H. Joline and Douglas Robinson acting as receivers of this court in respect of the property of New York City Railway Company.

A proposed report in acordance herewith may be submitted on behalf of both petitioners on May 5, 1911, the respondents to have five days within which to file with me objections and proposed amendments after service upon them of a copy of the proposed draft report.

When the matter of accounting between the two estates, Metropolitan Street Railway and New York City Railway, was about to be taken up, it was apparent that the special master would be confronted with a crucial question, viz., whether the lease continued in force until August 1, 1908, or whether its obligations ceased to be binding on either estate on October 1, 1907. It was decided that such question should be taken up and determined as a separate proposition, the special master to pass upon certain individual payments as "types" so as to make the order to be entered upon his report a final one. See opinion Penn. Steel Company v. New York City Railway Company (C. C.) 182 Fed. 155 (Sept. 21, 1910), and order December 2, 1910. The special master took testimony and filed his report, exceptions to which are now before this court.

Davies, Auerbach, Cornell & Barry, for appellant Guaranty Trust Co.

Bronson Winthrop and Charles T. Payne, for appellant Farmers' Loan & Trust Co.

J. Parker Kirlin, for appellant Metropolitan St. Ry. Co.

Morgan J. O'Brien, Charles E. Rushmore, James Byrne, George N. Hamlin, and Charles M. Travis, for appellees Pennsylvania Steel Co. and contract creditors committee.

Benjamin S. Catchings, for appellee tort creditors committee.

Matthew C. Fleming, for appellee receiver of New York City Ry. Co.

Arthur H. Masten, William M. Coleman, and William M. Chadbourne, for receivers of Metropolitan St. Ry. Co.

LACOMBE, Circuit Judge. The special master held that the lease of February 14, 1902, between the Metropolitan and the New York City Companies should be deemed to have been no longer in effect aft-

er September 24, 1907. He also held several other propositions as to accounting which followed as the necessary consequence of such decision. Exceptions were reserved to his findings by Metropolitan interests, and the whole subject has been argued fully before the court.

The special master filed with his report a very careful opinion, which sets forth exhaustively all the facts bearing upon the question presented, and renders it unnecessary to restate them here. A fundamental and controlling circumstance of the situation is the fact that almost at the outset this court was applied to, to appoint receivers of the lessor company under circumstances which the Supreme Court has held warranted such relief. "Having jurisdiction over the New York City Railway Company, and receivers having been appointed for it, there was every reason for extending the receivership to the Metropolitan Railway Company. The facts showed that it was so tied up with the New York Company that a receivership for the latter ought to be extended to the former. The circuit judge so held, and we think very properly upon the peculiar facts of the case." In re Konrad, 208 U. S. 90, 28 Sup. Ct. 219, 52 L. Ed. 403. When this decision was handed down (January 25, 1908), the same individuals were receivers of both roads "as holders of the interests of both lessor and lessee," and this court had stated why at that stage it seemed practical to adjust all questions in a single receivership. Penn. Steel Co. v. New York City R. Co. (C. C.) 157 Fed. 442. Of which disposition of the case the Supreme Court said that it was "well calculated to bring about the earliest possible conditions when those who may be the owners of the property shall be in possession of and operate it." In re Konrad, supra.

This dual receivership, however, did not exist on September 24, 1907. It began only when the application of the Metropolitan road was granted, October 1, 1907. It is thought, therefore, that the special master erred in finding that the lease should be deemed to have been no longer in effect after September 24, 1907. The date should have been October 1, 1907, and the special master's report should be corrected accordingly.

With this exception, the reasoning and conclusions of the special master are fully concurred in. They are in accord with the court's understanding of the effect of the dual receivership created October 1, 1907. It is not surprising that among the many deliverances upon various questions which have been presented during the past four years there are to be found expressions which would seem to indicate an understanding that the roads were being operated under the lease. But the language of the first opinion (157 Fed. 442) indicates the intention of the court, and passages from many other opinions cited by the special master or the appellees show quite clearly that the theory was to have receivers manage the property merely as operating conservators, leaving all questions, including the important one—whether or not the lease should be nonadopted and the public service which the property was obligated to perform rendered by the owner of the corpus—to be decided later.

Suggestion is made in the brief of the Farmers' Loan & Trust Com-

pany to the effect that at the time receivers were appointed it was supposed the lease might turn out to be profitable. It must be remembered that receivership followed an investigation of the affairs of both companies conducted by the public service commission, the details of which were published from day to day. It would seem that there could be few illusions left as to the situation and prospects. When the question arose, as it did at once, whether or not the interest on this mortgage due October 1st, should be paid, the court was strongly convinced that it should be defaulted, and expressed that conviction more than once at the conferences, where several interests were represented, and the question discussed. Such action would have at once settled the question of the lease, but it was not taken because, while the subject was under advisement, the lessor (owner of the corpus) petitioned to have the receivership extended to cover its property. It was thought that this made possible the creation of a receivership which would for the immediate present concern itself solely with the operation of the road and its restoration to a condition of efficiency, without undertaking to reach any conclusions as to who should receive the surplus over operating expenses, if there were any, or who should bear the burden of making the system perform its public duties with reasonable efficiency, if its income was insufficient so to do. It was certainly supposed by the court that, when the question came up for decision whether equity required that the estate of the New York Company should be relieved from the burden of an onerous and unprofitable contract, the question would not be embarrassed because in the meantime the receivers had used any money they could lay hold of, whether taken from the treasury or supply shops of the New York company, or received from insurance, or borrowed on pledge of the corpus. Practically the road could not have been run without the additional money, which no one would loan until the owner had put the corpus in receivers' hands, and which they could borrow only because of the action taken October 1, 1907.

With the change of date indicated, supra, the exceptions are overruled, and the report of the special master is affirmed.