PENNSYLVANIA STEEL CO. et al. v. NEW YORK CITY RY. CO. et al.

(District Court, S. D. New York. March 28, 1912.)

Nos. 2–9, 2–33, 2–149, 3–37.

STREET RAILROADS (§ 55*)—RIGHTS OF PURCHASER AT FORECLOSURE SALE— CONSTRUCTION OF DECREE.

A petition by the purchasers at foreclosure sale of street railroad property which had been operated by receivers for an order requiring the receivers to pay such proportion of certain charges against the property, such as taxes and sums due under leases falling due after the property was turned over, as accrued prior to that time, as operating expenses equitably chargeable to the receivers, denied on the ground that by the decree under which the sale was made the purchaser was required to pay such charges and under a proper construction thereof, was not entitled to have the same prorated, as to most of the items claimed, and on the further ground that it did not yet appear that the receivers would have any surplus applicable to such payment.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 134; Dec. Dig. § 55.*]

In Equity. Suit by the Pennsylvania Steel Company and another against the New York City Railway Company and another, and three other cases. On petition of the New York Railways Company for an order against receivers. Denied.

See, also, 190 Fed. 609.

Richard Reid Rogers and William M. Coleman, for petitioner.
Arthur H. Masten and Ellis W. Leavenworth, for receivers.

LACOMBE, Circuit Judge. This is an application by the New York Railways Company, assignee of the purchaser at foreclosure sale of the Metropolitan Railway System, for instructions to. the Metropolitan Railway receivers to prorate certain charges against the property purchased and to pay to the new company, such proportion of those charges as covers the period to January 1, 1912. The items are for such things as taxes, mortgage interest on the bonds of constituent roads falling due subsequent to January 1st, and similar charges. It is understood that petitioner does not dispute that upon the face of the papers, the decree, etc., it is primarily liable to the creditor. The theory is that, had there been no sale, the receivers would have paid these charges to keep the property together as a going concern; that, according to well-recognized rules of railway

bookkeeping, they are operating expenses to be prorated in all accountings. Therefore it is contended that, although by the terms of the decree the purchaser assumed liability, it is fair and equitable that out of the surplus in their hands resulting from operation until January 1, 1912, receivers should contribute the proportion of these charges which would cover the same period.

It may be remarked at the outset that this application, like the one recently considered as to tort claims (February 3, 1912), is founded on a misapprehension as to the existence of a surplus. It was stated on the argument that receivers have now about $1,300,000 in banks and trust companies, and, of course, have no longer any operating expenses to meet. But the court is by no means satisfied that the Metropolitan receivers have any real surplus resulting from operation. It will be remembered that immediately after the appointment of receivers of the New York City Railway Company and their taking possession of this system there fell due an installment of interest under the Metropolitan second mortgage, default in which would have been followed by the appointment of a receiver under mortgage pending foreclosure. Thereupon the Metropolitan Company itself asked to have the same receivers appointed as receivers of its property. This was done, and the court thereupon instructed them to pay the installment of interest then due. All this will be found discussed in 190 Fed. 609. The result was the creation of a dual receivership of the same property, the receivers operating it as conservators for all interests (in order that the franchises should not be imperiled by failure of public service); the question as to which road it was in whose interest such operation was conducted being left to be disposed of after the subject was more fully understood. In the case last above cited this court has found that on and after October 1, 1907, such operation was for the interest of the estate of the Metropolitan, and that the New York City estate was under no obligation to contribute thereto. The receivers kept on operating using any money they could get, from whatever source it might come, to pay expenses of such operation. It is understood that in this way they used much cash and a very large amount of supplies, all the property of the estate of the New York City Company, which amounted to much more than $1,000,000. There are also pending before the special master claims against receivers by the Second Avenue Railroad Company and the Central Park North & East Railroad Company for use and occupation of their lines by receivers and for conversion of property. These claims aggregate several hundred thousand dollars, and have not yet been liquidated by the special master. It is quite possible, therefore, that, when these three claims and such other smaller ones as there may be are liquidated and paid, they may exhaust the surplus from operation now in receivers' hands. It cannot safely be held now that the receivers have any money, free to respond to claims such as are made by this petitioner.

It is further suggested that receivers will receive a very large sum of money as the Metropolitan's distributive share of the proceeds of the two actions which were settled for $5,500,000. What the amount of that distributive share will be cannot be determined till the various

questions raised in the proceeding to determine it shall have been passed upon by the Court of Appeals.

The financial situation of the receivers might therefore fairly preclude the making of any such payments as are now asked for. But the peculiar terms of the decree are persuasive to the same conclusion. Counsel for petitioner refers to language of article 9 of the decree which provides that, upon assuming incompleted contracts of the receivers and certain other charges, "no purchaser shall be held personally liable under this article of the decree for *any unpaid indebtedness* of the receivers," etc. But the decree must be studied as a whole. Its history must not be forgotten. The financial condition of the system and its prospective future as they appeared at that time, over two years ago, should be borne in mind. Reference to 166 Fed. 569, and 168 Fed. 937, will show the various problems with which the Circuit Court struggled and the way in which it undertook to secure payment of all sorts of obligations, whose validity and amount were then uncertain and unliquidated. In a general way all such items, including receivers' indebtedness of every sort, were made liens on the property following it into the hands of the purchaser. If any surplus funds in receivers' hands were insufficient to pay them, then application would have to be made to the purchaser to make good. When the matter came up on review, the appellate court, appreciating (as did the Circuit Court) the possibility of large deficits, provided a much simpler method for dealing with them. Besides providing for liens on the property as to several items or for a sale subject to such items, they required the purchaser to pay $10,000,000 of his bid in cash. This amount by reason of a similar decree in the second foreclosure suit was increased to $12,000,000. These figures were made sufficiently large to assure the payment of everything and every prospective bidder was forewarned that, although he might use bonds on a proper basis for part of his bid, he must provide that fund, $12,000,000 in cash. Theoretically, upon the delivery of the deed, $12,000,000 actual cash was to pass to the special master, and, if there should be any claim against the receivers which they were without funds to meet, the special master would see that it was paid from that fund. For example, several millions of receivers' certificates falling due after sale and delivery of the deed, and the receivers being without funds to pay them, the same with accrued interest would be paid out of these proceeds of the sale. If subsequently it should be determined that some other party should have contributed towards such payment, the amount of such contribution would be turned over to the special master. Of course, when the receivers' certificates were thus paid, their lien would be extinguished, and the purchaser be relieved of that particular lien on his property. Practically the $12,000,000 was not turned over upon delivery of the deed, but is being paid in as called for. That circumstance, however, makes no difference in the legal situation.

The construction of the decree which this court understands to be correct may be made clearer by an illustration. Let it be assumed for the moment that petitioner is correct in its contention that, despite the provisions making bonds secured by mortgage on constituent parts

of the road a lien on the property in the hands of the purchaser, the interest on bonds of Columbus and Ninth Avenue Railroad from October 1 to December 31, 1911, is an operating charge which the receivers should pay. Let us also assume that, by reason of the payment of other operating charges, the receivers are without funds to make such payment. They would then advise the court of that fact, and thereupon an additional cash installment of the purchase price would be called for. Upon its receipt receivers would be put in funds, and would then repay to the railways company the amount it had paid for this accrued interest.

It must not be forgotten that $12,000,000 in cash is a part of the bid. The contract consummated by confirmation of the sale cannot be modified. Upon the amount of the bid the amount of the deficiency judgment was fixed. The $12,000,000 cash is to be paid in installments from "time to time  *  *  *  as the court may direct." While the various accountings are in progress and the amounts required to pay the several claims are uncertain, there will be need to require payment by the purchaser of no more than may be sufficient to pay each claim as liquidated. When, however, all the accountings are terminated, the court will require payment of so much of the $12,000,000 as may not have been already paid. That amount whatever it may be will go to the complainants in the foreclosure suits in proper proportions. If this construction of the Court of Appeals decree seems to any one not to be correct, it is hoped that an appeal may be taken from this order because it is highly important that receivers and the special master should definitely, while the accountings are going on, know just what the decree has settled.

In view of this comprehensive arrangement which the Court of Appeals substituted for the more detailed and intricate one, contrived in the Circuit Court, this court should be extremely cautious not to direct payments out of receivers' surplus, where under the decree there was a lien in favor of the creditor upon the property when the purchaser took it. This would call for an adverse decision as to the following items in the prayer of the petition, viz.: 1, 2, 3, 4, 5, and 6, and also subitems 1 and 5 of subdivision 14. Items 7 and 8 in the prayer of the petition and also subitems 2, 3, 4, 5, 6, 7, and 8 of subdivision 14 are really rental items, and should be prorated and the proper proportion paid by receivers.

It is especially important to follow the decree closely, and not to depart from its provisions because of any supposed equity towards the purchaser. The scheme of sale and payment was one carefully prepared, the fund it required that the purchaser should provide by paying a large part of the purchase price in cash was devoted to special purposes, and, apparently. if at the conclusion of the whole matter it shall be found that there is a balance in that fund, that balance would go to the complainant in foreclosure. All this was apparent when the property was offered for sale, and to make changes now would not be fair to the interests which the Court of Appeals undertook thus to protect. Indeed, it would seem to be beyond the power of this court to make such changes.

Petition disposed of as indicated in this opinion.